UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
|     GREGORY RIDGE | ) | Case No. 09-16223-SSM |
| | ) | Chapter 7 |
|                 Debtor | ) | |
| | ) | |
| BOARDWALK REGENCY CORP. | ) | |
| | ) | |
|                 Plaintiff | ) | |
| | ) | |
| vs. | ) | Adversary Proceeding No. 09-1354 |
| | ) | |
| GREGORY RIDGE | ) | |
| | ) | |
|                 Defendant | ) | |

**MEMORANDUM OPINION**

      This is an action to determine the dischargeability of a debt incurred by the debtor when he was extended $250,000 of credit to gamble at Caesars Atlantic City Hotel and Casino ("Caesars"), which is owned by the plaintiff, Boardwalk Regency Corporation ("Boardwalk"). A trial was held on July 16, 2010, at which the plaintiff and the defendant were each represented by counsel. After receiving evidence and hearing argument, the court took the issues under advisement. This opinion—the substance of which was read into the record on September 7, 2010—constitutes the court's findings of fact and conclusions of law under Rule 7052, Federal Rules of Bankruptcy Procedure, and Rule 52(a), Federal Rules of Civil Procedure.

Background

Gregory Ridge ("the debtor") runs a construction company. He filed a voluntary petition in this court on August 1, 2009, for relief under chapter 7 of the Bankruptcy Code, and received a discharge of his dischargeable debts on May 13, 2010. On his schedules, he listed a total of $1,126,239 in unsecured debts, of which $905,329 consisted of gambling debts owed to four New Jersey casinos, including Caesars.

The debtor—who had previously gambled at a number of casinos and had established credit at several of them—applied for credit at Caesars in July 2006. Except for the debtor's signature, the application was filled out by employees of Caesars, which was normally done based on information supplied by the customer. The application requested credit of $50,000 to $100,000, and represented that the debtor was the owner of a "R/E" business known as "Ridge Ltd. Co," from which he earned $280,000 per year. The only asset shown on the application is "Home," which is valued at $500,000.[1] The boxes for credit card and other debts are slashed through, but the box for reporting debts to other New Jersey casinos reports $30,000, and the application lists two other casinos where the debtor had established casino credit. The application lists the names, addresses, and account numbers of two banks—SunTrust and Wachovia—at which the debtor maintained accounts. According to Boardwalk's director of

---

[1] It is unclear whether this figure was intended to represent the fair market value of the property or the equity after taking mortgages into account. The property was appraised in May 2007 at $1.8 million. The debtor testified that the mortgages against the property totaled $1.189 million, which would suggest an equity of somewhat in excess of $500,000 in July 2006, when the Caesars credit application was signed. By the time the debtor's bankruptcy case was filed three years later, that equity had unfortunately vanished, with the debtor reporting the value of the property on his schedules as $1.15 million, subject to deeds of trust in the amount of $1.335 million.

2

casino credit, Boardwalk checked a cental database that would provide the debtor's credit status at other casinos, obtained a consumer credit report, verified the debtor's residence address, and verified the current and average balances of the listed bank accounts. No evidence was presented as to what the reported balances were on that date, or what was shown on the consumer credit report. Boardwalk's witness testified that the credit decision would have been based more on the debtor's history at other casinos rather than on his bank account balance, because many customers do not keep large bank balances but transfer funds in and out as needed. In any event, Caesars approved a credit line of either $50,000 or $100,000, which was later increased to $250,000, "most likely" at the debtor's request, based on his gaming history.

On December 31, 2006, the debtor was issued a total of $250,000 in chips over a period of three hours in return for four "markers" totaling that amount. The markers took the form of counter checks drawn on the debtor's SunTrust checking account. The first, which was generated at 2:43 p.m., was in the amount of $100,000. The next three, each in the amount of $50,000, were generated at 3:21 p.m., 3:50 p.m., and 5:40 p.m., respectively. Each counter check contained the following pre-printed statement: "I REPRESENT THAT I HAVE RECEIVED CASH FOR THE ABOVE AMOUNT AND THAT SAID AMOUNT IS ON DEPOSIT IN SAID BANK OR TRUST COMPANY IN MY NAME. IT IS FREE FROM CLAIMS AND IS SUBJECT TO THIS CHECK."

The arrangement between Caesars and its customers allowed the customer a period of time—the length of which depended on the amount of the outstanding markers—in which to redeem them by payment in some other form before they would be put through the banking system. Based on the amount he owed, the debtor had 45 days to redeem the counter checks.

Subsequent to December 31, 2006, the debtor negotiated a $37,500 discount—which the credit manager referred to as a "cash comp," and which the director of casino credit testified was based on the debtor's "play history"—of the amount owed.  On February 12, 2007, he sent Boardwalk a check for $212,500 drawn on his Wachovia account.  According to Boardwalk's witness, it was not uncommon to use another check to pay off a customer's counter checks.  Upon receipt of the check, the markers were cancelled.  The Wachovia check was deposited, but was returned for insufficient funds.  After the debtor did not respond to notices mailed to him in February and April, 2007, Boardwalk ultimately obtained a judgment against him on October 22, 2008, in the Superior Court of New Jersey, Atlantic County, in the amount of $232,329.

On December 31, 2006—the date the debtor signed the markers—the balance in his SunTrust account was $38,633.  During the subsequent 45-day redemption period, the highest balance in the account was $124,052.  On February 12, 2007—the date the debtor signed the Wachovia check—the balance in that account was $495.  The debtor admitted that he knew the SunTrust account did not contain $250,000 at the time he signed the markers.  He testified that when he sent the $212,500 Wachovia check, he asked if Boardwalk would hold the check but was told it could not.  On the statement of financial affairs filed in his bankruptcy case, he listed "household income" from the operation of his business of $336,700 in 2007 and $334,000 in 2008.  Of that amount, he stated that approximately two-thirds was his.  The statement of financial affairs reports that the debtor is a 45% owner of Ridge Limited Company, and he testified that his wife owns the remaining interest.  In May 2007, the debtor refinanced the mortgage against his house in order, apparently, to reduce the monthly payment, since he

received no cash from the refinance.  The debtor further testified that he had unsuccessfully put his home up for sale with the hope that the proceeds would enable him to pay his debts.

<u>Conclusions of Law and Discussion</u>

I.

This court has subject-matter jurisdiction under 28 U.S.C. §§ 1334 and 157(a) and the general order of reference from the United States District Court for the Eastern District of Virginia dated August 15, 1984.  An action to determine the dischargeability of a debt is a core proceeding in which a final judgment or order may be entered by a bankruptcy judge. 28 U.S.C. § 157(b)(2)(I).  Venue is proper in this district under 28 U.S.C. § 1409(a). The defendant has been properly served and has appeared generally.

II.

A chapter 7 discharge does not discharge an individual debtor from certain types of debt, including debts

> for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>> (A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition*;
>>
>> [or]
>> (B) use of a statement in writing—
>>> (i) that is materially false;
>>> (ii) respecting the debtor's or an insider's financial condition;
>>> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
>>> (iv) that the debtor caused to be made or published with intent to deceive.

§ 523(a)(2), Bankruptcy Code.  It is important to note that different standards apply depending on whether the false statement is one "respecting the debtor's . . . financial condition."  If it is, the statement must be in writing and the creditor must have "reasonably" relied on it.

5

§ 523(a)(2)(B), Bankruptcy Code. Other types of misrepresentations need not be in writing and the creditor's reliance need only be "justifiable," which is a lesser standard than "reasonable." § 523(a)(2)(A), Bankruptcy Code; *Field v. Mans*, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995). The burden of proof is on the plaintiff, and the standard of proof is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

### III.

The complaint in this action is pleaded in three counts. Count I alleges that the debtor's liability to Boardwalk is excepted from discharge under § 523(a)(2)(A) because the extension of credit and the granting of the cash comp were obtained by means of false representations because the debtor had neither the ability nor the intent to pay either the counter checks or the check he provided to redeem them. Count II alleges that the debt is alternatively nondischargeable under § 523(a)(2)(B) because the pre-printed statement on the counter checks that the debtor had funds on deposit sufficient to cover them was a false representation on which Boardwalk relied. And Count III alleges that the debt is non-dischargeable under § 523(a)(2)(B) because the credit application omitted substantial liabilities.

### A.

Only brief comment is required with respect to Count III. Other than the debtor's social security number, and the name, address, and account numbers of his bank, Boardwalk has not established that it relied on <u>any</u> information on the credit application, which in any event was not filled out by the debtor but by its own employees. Indeed, Boardwalk had little reason to rely on the debtor to report his liabilities, since it did an independent check of the debtor's credit at other

casinos and pulled a consumer credit report. No evidence was presented as to the contents of that report or that the debtor, at the time he filed the application, had any debts that were not reflected on the credit report or the casino credit database. The court can only conclude, therefore, that Boardwalk was as fully informed as it wished to be as to other debts the debtor may have had at the time the credit line was established. Accordingly, judgment will be entered for the debtor on Count III.

B.

That leaves for consideration Counts I and II. Count I relies on an implied representation that the debtor, when requesting the $250,000 in chips and the subsequent $37,500 "cash comp," had the expectation and intent of paying the debt. Count II relies on the express representation that the debtor had funds on deposit in the amount of the markers. Count I relies on § 523(a)(2)(A), while Count II relies on § 523(a)(2)(B). Since these provisions are mutually exclusive, *Blackwell v. Dabney*, 702 F.2d 490, 492 (4th Cir. 1983), it is necessary to first determine whether the marker is a statement regarding the debtor's financial condition. The Fourth Circuit has held that for the purpose of § 523(a)(2), a statement regarding financial condition is not limited to formal financial statements. *Engler v. Van Steinburg*, 744 F.2d 1060, 1060-61 (4th Cir. 1984) (holding that a false oral statement that collateral being offered as security was unencumbered was a statement concerning the debtor's financial condition). Indeed, in *Trump Plaza Assocs. v. Poskanzer (In re Poskanzer),* the court, under similar facts, held that casino markers that included language certifying that funds were on deposit in a debtor's bank account to cover the amount of the marker were statements regarding the debtor's financial condition. 143 B.R. 991, 1000 (Bankr. D. N.J. 1992). The statement on the counter

checks that the amount shown "is on deposit in said bank or trust company in my name [and] . . . is free from claims and is subject to this check" not only addresses the amount on deposit but the absence of liens or adverse interests. Just as in *Poskanzer* and *Engler*, the court concludes that such a statement is one regarding the debtor's financial condition, with the result that § 523(a)(2)(B) governs the dischargeability of the debt. *Blackwell*, 702 F.2d at 492 (holding that where debtor's misrepresentations are statements regarding the debtor's financial condition, § 523(a)(2)(B) applies to the exclusion of § 523(a)(2)(A)).[2]

C.

There is no doubt that the representation that the debtor had funds on deposit at least equal to the amount of the markers was not true at the time it was made. The markers were in the aggregate amount of $250,000, and the amount on deposit was $38,633. Of course, in order to support a determination of nondischargeability, a representation regarding financial condition must not only be false, but must be materially so, and must have been made with intent to deceive. With respect to the debtor's intent, direct proof is not necessary; instead, the court may draw inferences from the circumstances surrounding the statement. *Norwest Card Servs. v. Barnacle (In re Barnacle)*, 44 B.R. 50, 54-5 (Bankr. D. Minn. 1984). The final element is whether Boardwalk reasonably relied on the statement. Reasonable reliance requires, among other things, actual reliance. *See Field v. Mans*, 516 U.S. at 68, 116 S. Ct. at 442. ("Section

---

[2] Even if § 523(a)(2)(A) applied on the theory that the debtor knew he had no ability to pay the debt at the time he contracted it and never had any intention of paying it, the evidence at the trial was simply not sufficient to support such an assertion. While the debtor's apparent hope of paying his losses at one casino with winnings from another seems objectively something of a long shot, and while in the long run the odds necessarily favor the house against the gambler, some finite percentage of gamblers do win substantial sums of money.

523(a)(2)(B) expressly requires not only reasonable reliance but also reliance in itself. . . .").  In *Mirage-Casino Hotel & Treasure Island Corp. v. Simpson (In re Simpson)*, the bankruptcy court held that where a casino relied not on a debtor's credit application or signed markers, but on his play-and-pay history, it did not rely, much less reasonably rely, on the debtor's statements regarding his financial condition.  319 B.R. 256, 261 (Bankr. M.D. Fla. 2003).

       The complicating factor, not only with respect to materiality and intent to deceive, but most importantly, with respect to reasonableness of reliance, is that neither Boardwalk nor the debtor expected that the counter checks would necessarily be presented for payment.  Caesars, consistent with New Jersey law, *See* N.J. Stat. Ann. §5:12-101c,[3] allowed the debtor 45 days in which to redeem the counterchecks by providing payment in some other form, which might very well come from some source other than the account on which the counter checks were drawn.  The counterchecks, in short, were not the expected mode of payment, but rather a back-up.  That being the case, the reality is that Boardwalk was relying less (if at all) on the account balance on a particular date—which is any event is no assurance that the funds would still be there 45 days later—than on the customer's general financial condition and established record of payment.

---

[3] The relevant part of the statute states:
> When a casino licensee or other person licensed under this act, or any person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, cashes a check in conformity with the requirements of subsection b. of this section, the casino licensee shall cause the deposit of such check in a bank for collection or payment, or shall require an attorney or casino key employee with no incompatible functions to present such check to the drawer's bank for payment, within *** (3) 45 calendar days of the date of the transaction for a check in an amount greater than $5,000.00. Notwithstanding the foregoing, the drawer of the check may redeem the check by exchanging cash, cash equivalents, chips, or a check which meets the requirements of subsection g. of this section in an amount equal to the amount for which the check is drawn . . . .

N.J. Stat. Ann. §5:12-101c.

Having considered all the evidence, the court cannot find that Boardwalk has met its burden of showing that it relied on the debtor's statement that he had funds in SunTrust on December 31, 2006, equal to the amount of the markers.  It appears, rather, that Boardwalk relied primarily if not exclusively on the debtor's credit history with other casinos and on his play-and-pay history at Caesars.  But even if it did rely on the statement on the markers, it has not established that its reliance was reasonable, since it presented no evidence that on the (apparently) one occasion it did verify the account balance at SunTrust,[4] the balance bore any relationship to the amount of credit being granted.  Accordingly, the court concludes that Boardwalk has not carried its burden of showing that it reasonably relied on the debtor's statement had sufficient funds in the account to pay the check.

    A separate judgment will be entered determining that the debtor's obligation to Boardwalk is dischargeable and has been discharged.

Date: _____          _____
                                                                                    Stephen S. Mitchell
Alexandria, Virginia                                                   United States Bankruptcy Judge

---

[4] No evidence was presented as to what additional verifications, if any, were performed when the credit line was increased to $250,000.

Copies to:

Kyle G. Manikas, Esquire
Manikas Law Offices, PLLC
10513 Judicial Drive, Suite 203
Fairfax, VA 22030
Counsel for the plaintiff

Nathan A. Fisher, Esquire
3977 Chain Bridge Road, #2
Fairfax, VA 22030
Counsel for the defendant